[No. 9252.     Department Two.     February 7, 1911.]

HUGH   McSORLEY,  *Appellant*,   v.   J.   W.   BULLOCK,
*Respondent*.[1]

TRUSTS—CONSTRUCTIVE TRUSTS—EVIDENCE—SUFFICIENCY. A con-
structive trust is shown, by clear and convincing testimony, al-
though the evidence of the two parties in interest is in direct con-
flict, where it appears that the plaintiff was interested in a bank-
rupt corporation and applied to the defendant for an advance to
enable him to bid for the assets at a receiver's sale, that the de-
fendant consented, and stated to others in plaintiff's presence that
he was bidding in the property for the plaintiff and that there was
not time, and it was not necessary to draw up a contract, the plaintiff
taking an active interest in the sale, the arrangement being that
defendant was to take the bill of sale in his own name for security
only, after which he repudiated the trust and converted and sold
the property.

SAME—FRAUDS, STATUTE OF—POSSESSION OF TRUST PROPERTY. The
statute of frauds does not apply to an oral agreement to advance the
money to bid in property at a sale and hold the same in trust for
another, whereby a constructive trust is created, and it is immaterial
who had possession of the property.

TROVER AND CONVERSION—DAMAGES—MEASURE—TRUSTS — LIABIL-
ITY OF TRUSTEE. Where a trustee sells and dispossesses himself of
property bid in by him and held in trust for another, he is guilty of
a conversion, and the measure of damages is the market value of
the goods at the time of the conversion, with interest, less the sum
advanced by the trustee on the purchase price.

Appeal from a judgment of the superior court for King
county, Robert H. Lindsay, Esq., judge *pro tempore*, en-
tered April 25, 1910, in favor of the defendant, after a trial
on the merits before the court without a jury, in an action
for conversion.   Reversed.

*Brady & Rummens*, for appellant.

*Fred H. Peterson* and *Philip D. Macbride* for respondent.

DUNBAR, C. J.—The appellant brought this action against
respondent to recover $1,361.73, the alleged reasonable

[1]Reported in 113 Pac. 279.

value of a certain stock of goods, alleged to have been the property of the appellant and converted to his own use by the respondent. The allegations of the complaint are to the effect, that a certain stock of goods which belonged to a corporation which was in bankruptcy, the goods being in the hands of a receiver, were to be sold by the receiver under the direction of the referee in bankruptcy; that appellant had an interest in the corporation and the goods and, being desirous of purchasing the same at the receiver's sale, made an arrangement with the respondent to bid the same in for him, and to take the bill of sale for same for his security until he (the appellant) should refund the amount of money so advanced, and agreed upon the time and upon a reasonable payment to the respondent for the money advanced and for his time; that shortly after the receiver's sale, the respondent converted the goods to his own use and sold them to a third party. This complaint was denied by the respondent, his contention being that he bought the goods on his own account, having had no agreement whatever with the appellant in regard to the same. Upon these issues the case went to trial without a jury, and a judgment was rendered that the plaintiff take nothing by his complaint, and that the cause be dismissed. From this judgment, this appeal is prosecuted.

The court made no findings of fact or conclusions of law. It is conceded that this agreement, if any, was an oral agreement. The testimony is absolutely conflicting. If the testimony of the appellant is true, the respondent was acting as his trustee in the transaction, and it being conceded that he converted to his own use the stock of goods in question, he is bound to the appellant for their value. If, on the other hand, the testimony of the respondent is true, the appellant had no interest whatever in said goods.

There is no possible way of reconciling the testimony. The appellant, McSorley, testified that, being anxious to obtain this stock of goods and having failed to obtain the

money from other sources to bid them in at the receiver's sale, upon the day of the sale, about ten o'clock in the forenoon—the sale occurring in the middle of the afternoon, he called the respondent up by telephone, told him of his desires in regard to the purchase, and asked him to advance the money; that respondent answered, saying: "Why, that is a surprise to me. Yes, I will be right down in a few minutes;" that in response to the telephone, the respondent did come down to the store where these goods were in the possession of the appellant; that they talked the matter over and respondent informed appellant that he had a lot of money in his pocket, which he got on his way down; that they made the arrangement alleged in the complaint; that appellant informed Bullock that they would have to be in a hurry as the sale was to take place at two o'clock, and that they had better go and have an agreement drawn up; that they then repaired to the office of Judge Gay, who was at that time a practicing attorney in Seattle; that before Judge Gay made his appearance, Bullock said to McSorley: "Well, Mac, how are you going to fix me up on this?" " 'Well,' I says, 'I will tell you,' I says; 'I want money enough to buy this stuff with and I will pay you for the use of your money and as security you take the bill of sale in your name for about three weeks, and I will be able to pay you back.' Mr. Bullock said: 'That is perfectly satisfactory, Mac. That is all right. Let's go in and see Mr. Gay;'" that he informed Bullock that he would put in a special sale of the goods in order to get his money back quickly, and that Mr. Bullock replied that that would be a capital idea; that he told Bullock he would pay him a reasonable amount for the use of his money and for his trouble. This conversation is denied *in toto* by Bullock, and he disclaims ever having had any conversation with McSorley on the subject. He does admit, however, having gone to Judge Gay's office with McSorley for some purpose, and says that it was for the purpose of having Gay draw up a bid for him.

If the testimony stopped here, conceding the witnesses to be of equal reputation and standing, and considering that their testimony was heard by the lower court, and that the burden of proof was upon McSorley to establish his claim, we would be compelled to affirm this judgment. But outside of the testimony on other propositions, which is not important in determining the main question, there is testimony upon the direct question as to whether or not this contract was made which seems to us to turn the scales in favor of appellant. If, as Bullock says, McSorley had no interest in the affair, it is difficult to understand why McSorley would be accompanying him on these trips to the office of Judge Gay and to other places mentioned in the testimony, and why he would appear so actively in the transaction. But the testimony of Judge Gay was to the effect, that McSorley and Bullock called upon him that afternoon; that McSorley was an old client of his; that he took such an interest in McSorley's obtaining these goods that he went down to Judge Hoyt's office and obtained the postponement of the sale for an hour or more; that the matter was talked over in his presence; that in Bullock's presence McSorley made the statement that Mr. Bullock was going to buy this property for him; that the sale had been put off really to wait for McSorley's bid; that Judge Hoyt, referee in bankruptcy, had continued it from time to time to get McSorley's bid, wanting to give him the best show, and they fixed it up; that at that time he asked Bullock and McSorley if they wanted a contract drawn between them to show the nature of that transaction, to which Mr. Bullock said in reply: "No, we understand each other thoroughly and there will be no necessity for any contract. We have not much time anyway. We will have to hurry to get over there;" that the general trend of the conversation was that Bullock was buying it for McSorley. And the witness concluded by saying: "That was my absolute belief at that time from what they said."

The testimony of Walter McClure, the attorney for the-

receiver, was to the effect that McSorley and Bullock came to his office together, to obtain the bill of sale of the property which Bullock had bid in. He testified further as follows: "That it was understood by me, and I am of the opinion it was understood by all those present, that Mr. Bullock was buying the property for Mr. McSorley." In further answer he said: "At that time Mr. Bullock said to me that he was buying the property for Mr. McSorley;" that he said substantially that he was in the fuel business and was not in the harness business or the saddler business, and had no use for a business of that kind, and he was buying the property for Mr. McSorley, and that he expected Mr. McSorley to pay him back the money he had advanced for him; and the testimony showed that there were congratulations extended by the receiver and others at the time of the sale to Mr. McSorley, for the reason that it was generally asserted and understood that the bid was in McSorley's interest and that all parties concerned were glad that he was able to obtain his goods again.

It is undoubtedly true, as contended for by respondent, that in an action of this kind the testimony on the part of the party claiming the trust in his behalf must be clear and convincing, and that the burden of proof rests upon him. Conceding this rule, we think it has been successfully met by the appellant, and that the overwhelming weight of authority is to the effect that the property in question was bought for the appellant, and that a trust was thereby created. This corroborating testimony is by disinterested witnesses whose reputation and standing are conceded. With the view we take of the testimony, then, a constructive trust was established. The property was bought by respondent to be held in trust for appellant, and the bill of sale was simply intended for respondent's security for the money advanced. In other words, he was appellant's trustee, and having wrongfully dispossessed himself of the property entrusted to him, he must answer to appellant for its value. The testi-

mony is conflicting on the question of whether the appellant was placed in possession of the goods, both parties claiming to have possession until the same were sold by the respondent; but the determination of that question is not material so far as the application of the statute of frauds is concerned, for constructive trusts, like resulting trusts, do not fall within the statute of frauds. Bispham's Principles of Equity (6th ed.), § 95; *Peterson v. Hicks*, 43 Wash. 412, 86 Pac. 634; *Borrow v. Borrow*, 34 Wash. 684, 76 Pac. 305.

Finding, then, that the respondent had dispossessed himself of the trust property, appellant's only effective remedy is an action for damages. What is the measure? It must be the market value of the goods taken at the time of the conversion, with interest from such time. Now, the invoice price of the goods was $3,629.42. Deducting from this amount $150, which represents goods sold between the time they were invoiced and the date of the purchase by respondent, we have $3,479.42, the invoice price of the goods at the date of the purchase. The appellant testified that these goods were worth one hundred cents on the dollar, and they might have been to him under the circumstances. But the testimony of disinterested witnesses, although they were respondent's witnesses, was to the effect that, to a purchaser who had to move the goods to some other locality, the fair market value would be from seventy to ninety per cent of the invoice price. Adopting the mean valuation of eighty per cent, we have an established value of $2,783.53, and deducting from this the amount of the purchase price, $1,769.25, after all proper deductions were made, the amount due to appellant was $1,014.28.

The judgment will be reversed, and the cause remanded with instructions to the lower court to enter a judgment in favor of the appellant for that amount, with legal interest from the date of the conversion of the goods by the respondent.

RUDKIN, CROW, CHADWICK, and MORRIS, JJ., concur.