[No. 30086.   Department One.   April 24, 1947.]

MELVIN MOE et al., *Respondents*, v. DELBERT C. BRUMFIELD et al., *Appellants*.[1]

*Donn F. Lawwill* and *O. M. Nelson,* for appellants.

*Paul O. Manley,* for respondents.

SCHWELLENBACH, J.—This is an appeal from a judgment decreeing that respondents were the owners in fee of certain real property located in Grays Harbor county, and that appellants had no right, title, claim, or interest therein.

The complaint alleged ownership in the property. In order to better understand the issues involved, we quote in full paragraphs Nos. 3 and 4 of the complaint.

"3.   On or about May 8, 1942, the plaintiffs made, executed and delivered unto the defendants, Delbert C. Brumfield and Beaulah Brumfield, a quit claim deed covering all of the real estate described in the foregoing paragraph. The sole purpose of the execution and delivery of said deed was as follows:

[1]Reported in 179 P. (2d) 968.

"The plaintiffs had sold unto the defendants, Delbert C. Brumfield and Beaulah Brumfield, the cascara bark on said lands and had given them a period of two years in which to peel and remove said cascara bark. In order to relieve the plaintiffs from any liability caused by fire on said lands during the time the cascara bark was being peeled and removed, it was agreed by all parties that the deed afore-mentioned be executed so as to cause it to appear that the said Delbert C. Brumfield and Beaulah Brumfield were the owners of said property during said period, and that they would be solely responsible for any damages caused by fire started on said premises. It was specifically and mutually agreed between the parties however, that no title was actually to pass to the said Delbert C. Brumfield and Beaulah Brumfield, and that said deed would not be placed on record, and that at the expiration of said two years' period, the said Delbert C. Brumfield and Beaulah Brumfield would return said deed to the plaintiffs for cancellation.

"4. Subsequently, and on or about August 28, 1942, the defendants, Delbert C. Brumfield and Beaulah Brumfield, entered into a conspiracy with C. S. Hopper and Jane Doe Hopper, husband and wife, with the intent and purpose of fraudulently depriving plaintiffs of their title to said lands. In pursuance of this conspiracy, the said Delbert C. Brumfield and Beaulah Brumfield made, executed and delivered to C. S. Hopper and Jane Doe Hopper, husband and wife, a quit claim deed to said real estate, and the said C. S. Hopper and Jane Doe Hopper well knowing that Delbert C. Brumfield and Beaulah Brumfield had no legal title to said lands, and no right to transfer title or right of possession to the same, accepted said deed. That thereupon the defendants, C. S. Hopper and Jane Doe Hopper took possession of said real estate and are now in actual possession of the same and do now and have at all times refused to permit plaintiffs to take possession of said real estate. That plaintiffs are informed and believe that all of the defendants claim some right, title and interest in and to said real estate, although the true fact is that none of the defendants have any right, title or interest in and to said lands, and that the plaintiffs are the rightful owners, and are entitled to full and exclusive possession thereof."

These allegations were denied by the defendants.

During the trial, defendants timely objected to the introduction of any parol testimony concerning the above

transaction, relying upon the statute of frauds. The trial court announced that it would hear the testimony and rule on its admissibility later.

The testimony is in conflict. The plaintiffs and their witnesses testified that they purchased this land from the county in the latter part of 1941 for three hundred fifty dollars; that in May of 1942 they were contacted by Brumfield, who wanted to strip bark from the trees. There was a dispute as to the price; Brumfield offered four hundred twenty-five dollars, but plaintiffs wanted one thousand dollars. It was finally agreed that the price would be six hundred dollars. On May 8th, they went to the office of an attorney in Aberdeen to have the papers drawn. The Moes testified that Brumfield wanted a deed to show to the fire warden; that the deed was drawn up and it was agreed that it would not be placed on record, and that, at the expiration of two years, it would be returned to the Moes for cancellation. This agreement was oral; there was nothing in writing.

The attorney was somewhat hazy in his recollection of the transaction, the parties merely having come into his office to have the papers prepared. However, he did remember that they first talked about a lease and finally agreed upon a deed, to be returned after two years.

Some neighbors of Hopper's testified that in the summer of 1942 he remarked about the foolish deal the Moes had made. This was denied by Hopper, who testified that he hadn't known of the transaction and had never met Brumfield until two or three days before the deed was given to him on August 28th. As consideration for the deed, he paid twenty-five dollars, gave Brumfield a Ford car worth one hundred fifty dollars, and assisted him in getting the bark out.

Brumfield testified that he originally offered four hundred twenty-five dollars for the bark. This offer was refused by the Moes, who wanted one thousand dollars. It was finally agreed to sell the land to him for six hundred dollars.

The trial court found in its memorandum opinion that the deed was given to enable Brumfield to peel the bark

without interruption, and that he agreed to return it when the work was completed. It was further found that the Hoppers took the deed from Brumfield with full knowledge of the prior arrangement.

Rem. Rev. Stat., § 5825 [P.P.C. § 577-3], reads as follows:

"In the following cases specified in this section, any agreement, contract and promise shall be void, unless such agreement, contract or promise, or some note or memorandum thereof, be in writing, and signed by the party to be charged therewith, or by some person thereunto by him lawfully authorized, that it to say: (1) every agreement that by its terms is not to be performed in one year from the making thereof; . . ."

In *Brown v. Kausche,* 98 Wash. 470, 167 Pac. 1075, the husband died testate, survived by his wife and five children. By the will, all of the property was devised to the wife. No provision was made for the children, the will stating that the husband had perfect confidence in his wife to provide for them. Some years after the property was distributed to the wife, she conveyed it all to one son. The other children commenced an action, alleging that, at the time of making the will, it was orally agreed between the husband and wife that the latter should manage the property during her lifetime, and, upon her death, all of the children should receive it, share and share alike. The problem before the court was stated as follows:

"The will does not create the trust and it is not so claimed. The contention of the appellants is that the will was made pursuant to the previous oral understanding, and that, when Mrs. Kausche deeded the land to her son, which was a violation of the parol agreement, a trust thereby arose *ex maleficio.* If the trust sought to be established is an express trust, it must fail, because the evidence in support thereof is oral. On the other hand, if it is a resulting trust, or trust *ex maleficio,* it may be established by oral testimony. *McSorley v. Bullock,* 62 Wash. 140, 113 Pac. 279; *Womach v. Sandygren,* 96 Wash. 12, 164 Pac. 600."

After discussing previous cases of this court, it was held:

"In the present case, as in each of the cases cited, no fraud inhered in the original transaction. If the trust sought to be proved by parol in those cases was an express trust,

it necessarily follows that, in the case now before us, the trust sought to be established by oral testimony was likewise an express trust. It is true that, in each of these cases, the trust sought to be established was in favor of the grantor, while here it was in favor of third persons—the children of the testator and his wife. But this fact could make no difference in the application of the principle. If, in the cases referred to, the trust arose by act of the parties and not by operation of law, it necessarily follows that, in the present case, the trust arose in the same way, that is, out of the oral arrangement between Mr. and Mrs. Kausche, and was therefore an express trust."

See, also, *Arnold v. Hall,* 72 Wash. 50, 129 Pac. 914, 44 L. R. A. (N.S.) 349; *Nichols v. Capen,* 79 Wash. 120, 139 Pac. 868.

In *Farrell v. Mentzer,* 102 Wash. 629, 174 Pac. 482, we held:

"By no honest process of reasoning can the different decisions be harmonized or reconciled, and by no sophisticated reasoning should it be attempted to be done. We have drifted a considerable distance into the waters of confusion and it is time to return to the moorings, which are these: that the statute of frauds is not an equitable doctrine, but is an absolute statute which provides, so far as the question under consideration here is concerned, that parol evidence is inadmissible to establish an express trust in real estate. It may be that a strict application of the statute in some cases will operate to defeat a just claim, but that is not a sufficient reason for attempting to remove those cases from the operation of the statute by misnaming the character of the trust involved. It may be well to restate the fundamental characteristics of these varieties of trusts:

"(1)  Those trusts which are created by contract of the parties and intentionally. They are express trusts.

"(2)  Those created by operation of law, where the acts of the parties have no intentional reference to the existence of any trust. These trusts are (a) implied or resulting, (b) and constructive.  .  .  .

"A great deal of the confusion in the classification of trusts has arisen from the fact that some of the courts have mistakenly held that the breach of a contract constituted fraud, and have thereby attempted to convert the breach of an express contract which would have raised an express trust into a constructive trust created by fraud. The logical

result of such confusion would be to hold that the breach of every express contract would be the establishment of a constructive trust, and thus entirely obliterate express trusts. This point is well covered by Pomeroy as follows:

" 'The foregoing cases should be carefully distinguished from those in which there is a *mere* verbal promise to purchase and convey land. In order that the doctrine of trusts *ex maleficio* with respect to land may be enforced under any circumstances, there must be something more than a mere verbal promise, however unequivocal, otherwise the statute of frauds would be virtually abrogated; *there must be an element of positive fraud accompanying the promise,* and by means of which the acquisition of the legal title is wrongfully consummated. Equity does not pretend to enforce verbal promises in the face of the statute; it endeavors to prevent and punish fraud, by taking from the wrong-doer the fruits of his deceit, and it accomplishes this object by its beneficial and far-reaching doctrine of constructive trusts.' 3 Pomeroy, Equity Jurisprudence (3d ed.), § 1056."

Respondents rely on *Rozell v. Vansyckle,* 11 Wash. 79, 39 Pac. 270, and *Johnson v. Johnson,* 122 Wash. 117, 210 Pac. 382. In the former case, the respondent was the owner of eighty acres of valuable land. He was an old man, very ignorant, could neither read nor write, was mentally weak, was incompetent to attend to ordinary business, and was wholly incapable of transacting affairs of importance. He was afraid that one Conrad was seeking to establish a false claim against him. He had implicit confidence in the appellant and went to him for advice. The appellant added greatly to his fears, and induced him to deed the property to him (appellant) upon his promise to hold it in trust and reconvey it to the respondent upon his request. The trial court ordered a cancellation of the deed from respondent to appellant, and also ordered canceled a deed from appellant to one Gardiner. In affirming the judgment, we said:

"The parol promise upon the part of Vansyckle, and upon which the plaintiff relied, was made in bad faith and with intent to deceive, and hence amounted to an actual fraud. It was made by him without any intention of performing it; and the construction which the statute of frauds has almost universally received is that it excepts from its

operation trusts which arise from fraud, either actual or constructive. This we conceive to be the principle upon which the rule laid down by Pomeroy, Story and other writers on the subject, rests."

In the *Johnson* case, the parties lived in Alaska. The husband was very illiterate. Having absolute confidence in his wife, he conveyed all of his property to her. He was not aware of the fact that she had, for some time, been having an affair with another man. After receiving title to the property, she came to this state and was followed by her friend. The husband later came and started the action to set aside the deed. As to the facts, this court said:

"Without reviewing the evidence here in detail, we deem it sufficient to say that we are convinced, as the trial judge was, that Mrs. Johnson had, at the time of the making of the conveyances to her, made up her mind to abandon him and had induced him to convey the property to her, then intending abandoning him and appropriating it to her exclusive use."

In affirming the judgment setting aside the deed, we held:

"Whether we regard the conveyance as having been made by Mr. Johnson in pursuance of an oral agreement with his wife that she would hold the property in trust for him as his separate property or in trust for the community, she then having a present intention to claim absolute ownership thereof; or whether we regard the conveyance as a gift in consideration of the marital love and affection he bore her and the marital love and affection he then believed she bore him; the facts we have above summarized we think argue all but conclusively that he is entitled to now be restored to the ownership of the property as it existed at the time of the making of the conveyance in January, 1915. If she took the property by that conveyance in pursuance of a promise by her to hold it either for him or for the community, then intending to violate that promise, and did violate it, as we think the evidence shows, she committed a fraud entitling him to the relief he seeks. If the conveyance was a gift, as she claims, in which event it was manifestly made in consideration of the mutual marital love and affection which he then believed existed between them, she then having the intention to abandon him and

sever their marriage relations, she committed even a more grievous fraud, entitling him to the relief he now seeks."

It will thus be seen that, in the cases relied upon by respondents, there was a present intention on the part of the grantee not to reconvey, which made the transaction fraudulent in its inception. That was not the situation in the case under consideration.

In view of the allegations of the complaint, the trial court was justified in listening to the oral testimony in order to determine whether or not this was a trust *ex maleficio*. But when it developed that it was not such a trust, but at the most an express trust, then the statute of frauds controlled, and appellants' challenge to the legal sufficiency of the evidence and motion for dismissal should have been granted.

The judgment is reversed.

MALLERY, C. J., MILLARD, SIMPSON, and ABEL, JJ., concur.